Rachel Stevens, on behalf of the appellant Dreamstreet Investments, this is an appeal of the District Court's grant of summary judgment to the appellee, MidCountry Bank. Dreamstreet is appealing two of the claims that were dismissed in the District Court. First, the first issue before the Court is whether Dreamstreet's claim under the North Carolina Unfair and Deceptive Trade Practices Act was barred by the four-year statute of limitations, and second, whether there are competing inferences of fact that preclude summary judgment with respect to the claim for constructive fraud. If I may, please just remind the Court briefly of the key disputed and undisputed facts in this case. The case arises out of a seller holdback agreement executed between Dreamstreet and MidCountry Bank in the context of a land sale agreement of a piece of land owned by Dreamstreet sold to Carl Ingraham, who was MidCountry's under contract to sell the land to Ingraham. Ingraham obtained financing from MidCountry under a buyer-builder loan product to buy the land and build a home himself, acting as his own general contractor. Now, before closing on the sale, MidCountry's loan officer, Pete Flom, contacted Dreamstreet's president, Mr. Pittman, and proposed... Can I ask you initially about the statute of limitations, Graham? It's a four-year statute of limitations, is it not? Correct. And what concerned me, your suit was filed on June 28, 2013. Correct. And what concerned me was that an email, which was more than four years earlier, was sent on June 16, 2009. And in that email, Dreamstreet threatens to sue because MidCountry had refused to pay the seller holdback. Now, for statute of limitations purposes, why wouldn't you have been aware of your claim on June 16, 2009, when you sent the letter actually threatening to sue? Because I'm not sure that I've seen that many statutes of limitations cases where someone actually threatens to sue and has knowledge of the claim and then files more than four years later after they've threatened to sue. That would be an unusual ruling. Well, the parties have both agreed that the entirety of the seller holdback agreement is memorialized in the previous email that the only way the seller holdback funds would not be available is if the home wasn't completed or if Mr. Ingraham went into default. So, by the entirety of that agreement, MidCountry did not have any obligation of repayment and Mr. Pittman had no basis to demand repayment until the home was completed. Now, we agree he made a premature demand. You know, the testimony in the record is not clear why he did this, but... But it's not just the demand. I understand what you're saying about premature demands. It's the threat to sue. That's what makes it unusual, right? If it had just been a demand, I totally understand your argument. But how do you explain the part of the email that sure makes it sound like he thinks June 16, 2009, that he got defrauded and he's going to sue? You know, from Mr. Pittman's deposition testimony, you know, he was just hearing things from Mr. Ingraham and was concerned that the home wasn't going to be completed. Inquiry notice? Shouldn't he start asking around at that point? Well, if the parties have agreed that the, you know, entire agreement between them doesn't have a basis for MidCountry to repay until the... You had four years after that, after you threatened to sue, to actually bring suit, and four years transpired and you didn't do it. And a party never learns everything about a claim until you actually get into court and have discovery and everything. So notice doesn't mean that you know absolutely everything about a claim. Notice means that you know enough to bring a suit in good faith. And the email seems to suggest that you did. Right. Well, I think, you know, part of this was going on in the foreclosure proceeding as well. So, you know, that took a while to, you know, resolve. The... Apart from the statute of limitations issue, which I think that email, the reasons that we've suggested is very problematic. I don't understand why one wouldn't, in this situation, I'm not suggesting it's meritorious, but I'm suggesting it would have a better chance than a breach of fiduciary claim or an unfair and deceptive trade practices claim. And what's happening so often in North Carolina doesn't happen in other states. And that is people bring this UDTPA claim because it has a treble damage provision and they want to force a settlement out of here. And there's a... Sometimes, you know, you do better off not swinging for the fences, but just bringing a good old breach of contract claim. Why go through all of this very, very problematic stuff? Because this is a dispute between two businesses over a contract. It's not an unfair trade practice case. There's no, you know, there's no fiduciary duty running to you. You were advised by a banker and a real estate appraiser and a lawyer and everybody else when you engaged, when you entered into this contract. I mean, you're perfectly able to care for yourself and defend your client, to defend for itself in the course of negotiations and market and everything. And yet we have these sort of ersatz legal claims. Well, I think that's the point that this, you know, agreement was such that it was completely in mid-country's discretion whether these funds were ever released. You know, the way that the default was not defined and the term completion of construction wasn't defined. Well, Ingram defaulted on a loan, did he not? He did. It is agreed he defaulted. But what's not agreed is the date he defaulted. Well, but he did default. And wasn't the, the seller holdback was not going to be forthcoming if the borrower, Ingram, defaulted on the loan? Well, you know, a reasonable juror could find there's competing inferences that could be drawn from the facts. One is that the obligation of repayment arose before the default because the certificate of... He defaulted on the loan after the duty of repayment already arose. After the what? After, after mid-country's duty to refund the seller holdback funds to Dream Street. At the date of the certificate of occupancy was obtained in December, and then the notice of default was not issued to Ingram until February. And what, if there was, if, and when there was a default, what was the obligation of mid-country with respect to the holdback funds? You know, the, the, it says that they still had an obligation to use those funds to complete construction of the home. And the implication there is, if they had done that, Dream Street could have recovered the money. But Mr. Dish, excuse me. I'm sorry. No, go ahead. Well, did they, had they, did they use the holdback funds to complete construction? They did not. Well, where's the money now? It, it was retained to mid-country's benefit. What? It was, mid-country retained it for its benefit. You know, they claim that they, you know, suffered a net loss on... These conditions were framed in the alternative. One had to do with the state of completion of construction.  And it seems to me, going into this negotiation and contract, you were charged with knowledge that if either one of these things happened, you might not get that seller holdback. And, and, and that was, that was in the contract. But it, I mean, is it framed that way? Or is it, if he completed construction first, then the seller holdback funds should be released, notwithstanding the default? Well, it doesn't say it's going to get back to you. It says if he defaults for failure to complete construction, they're going to use the holdback funds to complete the construction. Correct. And they didn't? No, they did not. And is there evidence in the record from which, you said then there's an, there's an inference that they would have sold it for more and then... Oh, well, there's an... What in the record shows any causal link between that and an actual injury to your client? Between... Between the failure, I'm assuming now a failure by the bank to put the money toward the construction injury to your client. Where in the record do I find the link between those two things? Well, the implication is that if they had used the funds for... No, that's the implication. But I'm just wondering, is there anything in the record that would support that? You know, the, there's testimony by Steve Odenkirk testified that that's, understanding that when, you know, a loan is resold on the secondary market, that would have cleared out, you know, MidCountry's loan as well as Mr. Pittman's. There's like, okay, an estimate of the difference it would have made in the resale value of the land? Yes. Okay. And I have another question about the timing of the default. Yes. So you're relying on the fact that MidCountry sends the notice of default in February, but doesn't the notice say that Ingraham has been in default since September when his loan was due? Well, you know, for the purposes of the email agreement entered into between MidCountry and Dream Street, it doesn't define what default is. Are you in default when you're one day late on your payment? Or is default a more technical legal term that it, the bank has to actually give a notice that you're in default? Who do hold back funds belong to? Dream Street. Who borrowed the money? Ingraham. Well, he borrowed it and he didn't get it. The bank kept part of it. Correct. That was the holdback. Why wasn't it his money that the bank was holding to complete construction if there was a default or failure to complete construction? That's what it said. If there's a default or a failure to complete construction, then MidCountry uses the holdback funds which Ingram borrowed to complete construction. Well, Dream Street contends that the home was completed and they had no basis. Well, Dream Street didn't borrow the money. No, Dream Street lended money in effect to the bank. Ingram borrowed the money. Because the bank couldn't otherwise. The bank kept $43,000 or got $43,000 of it. It was holding it back, but it still belonged to Ingram, didn't it? He was, he borrowed it. It was, it was part of the purchase price of the home. No, but with the whole, well, you say it's Dream Street's money. Yes. And Ingram was not a party here. He was at one time and then y'all dropped or somebody dropped him out. We did. But no question about what the, whoever the money then belonged to. It was used, it was to be used for one purpose and that was to complete construction. And it was not used to complete construction. That's correct. So what happens if it's not used to complete construction? Who gets the money? Well, I mean, MidCountry's the only one that hung on to it. I mean, on the status of this case, MidCountry gets to keep the money. That's what they did. Did it ever belong to MidCountry? They, you know, they proceeded to foreclosure and. Well, they bought, they pleaded foreclosure and bought the property in. Right. But the holdback, but how the holdback funds, it doesn't say that they can use it to complete construction or do something else with it if they decide to, if they buy the property in. I mean. I don't know. I mean, this is a mess. This looks to me like. Right. You know, the money was, you know, set out on the, you know, dispersal agreements. But then, you know. I mean, I thought this case more complicated than we had the death of the case here a few minutes ago. It is. It wasn't near as complicated as this to me, but. I don't understand how this, any of this rises to the level of a treble damage UDTPA claim. The North Carolina courts have been very careful about unleashing this kind of claim. And what you have here is a normal contractual squabble between. And you never bring a breach of contract claim. And there's statute of limitations problems. And yet you think you're going to succeed on a UDTPA claim. But the North Carolina courts have been insistent in saying that ordinary business disputes, like the kind we have here, are not going to rise to the exceptional circumstances needed to succeed on a UDTPA claim. That breach of contract claim covers something like this. It was never brought. And the UDTPA claim demands something that's really bad. And generally with someone who's unable to defend themselves. But you're able to defend yourself. You signed the contract. You knew what risk you were going to take. You knew without the seller hold back, there would have been no loan to Mr. Ingram. And you ran, you know, you ran the risk. Now, if you think they breached the contract, breach of contract. OK, breach of contract claim. But to bring a fiduciary duty claim and a UDTPA claim. Or the run of the mill contractual dispute. And even apart from the statute of limitations problem, which is substantial. It, you know, it just seems to me both in terms of statute of limitations problems, in terms of business law in North Carolina, you're trying to take a wrecking ball to it. Well, respectfully, Your Honor, this does rise to the level of egregious conduct. Mr. Pittman was not aware of the purpose of the seller hold back agreement at the time he entered into this. Pete Flom represented to him that this was just a normal part of the buyer builder loan product. When in reality, it was a mechanism that he devised under the table, outside of, you know, the normal course of the bank's business, to qualify a lender that could not otherwise qualify for this loan. A bank is taking money from a third- Can you refer some of this for rebuttal? Because you have saved some time for rebuttal. Can I ask just one very quick question? Sure. Sorry, I just don't want to lose track of this. I just want to make sure I understand the structure of your argument on the constructive fraud claim. And this is the part about how the money should have been put into the construction after the default, but wasn't. I mean, that all depends on there being a fiduciary relationship, right? Correct. Okay. And the district court, I think, you know, clarified it the best that by undertaking to hold this money, Main Country Bank was acting as a trustee. The district court sort of assumed that, didn't make a hold. The records were an assumption of that for the purpose of summary judgment. Mr. Levin. Thank you, Your Honor. My name is Robert Levin. I represent the defendant of Appleby Mid-Country Bank. We are here today to argue to this court that the ruling of the district court was correct. And that both of the claims that are here on appeal, the unfair and deceptive trade practices claim, that is barred by the applicable four-year statute of limitations, as well as the granting of summary judgment on the constructive fraud claim were both correct. This claim, as Your Honors are fully aware, arise out of the contract that was entered into by virtue of the email back in June of 2008. The court has correctly noted what the terms and conditions of that agreement were and that this agreement allowed for Mr. Ingerham and his wife to purchase a home and lot and for Mr. Ingerham to act as a general contractor to save some money. Mr. Pittman was represented by counsel, talked to his accountant, talked to other folks before he signed off on this agreement and agreed that the bank would withhold the $43,200 in order to allow this deal to close. But Mr. Pittman, on behalf of the plaintiff, did something further. He had the borrower execute a note and deed of trust for a little bit more, $49,500, to secure the seller holdback. So in case the bank didn't pay him back, he was protected. He had the second position note and deed of trust. And then when he received word about the foreclosure, he could have foreclosed himself or taken actions to protect the money that was owed to him from Mr. Ingerham. But he chose not to do that. As the court has correctly noted, the email in June of 2009 where he says, I'm going to talk to my attorney, I'm going to sue you if you don't pay the money back, gave him the notice that he had a potential claim. And I believe, if anything, it was a breach of contract claim which they chose not to bring. Suit was not filed in this action until June of 2013, more than the four years from the date of the execution of the agreement. And if Your Honors look at the complaint, the allegations of unfair and deceptive trade practices are fraud in the inducement of this agreement, which is what I believe the district court found. But even if that's incorrect, certainly a year later in June of 2009, the plaintiff was on notice of a potential claim and could have enforced his rights at that time. Many a time when we have these statute of limitations questions, there's some real question as to whether somebody knew that they had a basis for suit. They were, you know, in ignorance of it. But here you almost have a smoking gun because you have an email stating the basis of suit and threatening, not only stating the basis of the suit, but threatening to sue over the seller hold back. And it would be a very unusual application of the statute of limitations to hold that someone was not on notice when they sent a letter stating the claim and threatening to  I agree, Your Honor. He mentions talking to his attorney and saying he's going to go see his attorney and bring a lawsuit because he wasn't getting his money back. But that statute of limitations issue only disposes of one of the claims. It's on appeal. That's correct. And the other claim that's on appeal relates to the money that your client kept. That's correct. And under the agreement, your client was supposed to use the money to finish the construction. That's correct. The terms of the agreement. Did it use the money to finish the construction? The record is unclear about that. What happened, I think, is in the record. Judgment needs to be cleared on it. Well, I don't know that it really matters because the fact is that there's no fiduciary relationship for the claim that's here. If it's a breach of contract. If you're holding somebody else's money, you don't have any kind of a fiduciary relationship? Money doesn't belong to you. You're the bank, right? We are the bank. And the conditions that were for the plaintiff to get the money back was not in default, house complete. And certainly he was in default or unable to complete construction. And he did not complete construction. That's correct, Your Honor. So then the issue is the house is foreclosed and ultimately is sold. But in North Carolina, the case law is very clear. The money was supposed to be used to complete construction. That was the purpose of the money. If there was a default or unable to complete construction, then the money was supposed to go to completing construction. And I submit to you that that is not. It wasn't supposed to go into somebody else's pocket. I submit to you that that is not a genuine issue of material fact that's in dispute because it doesn't matter. The issue on their claim, it's not a breach of contract claim, but for constructive fraud, you have to have a fiduciary.  But they're granted summary judgment on it. It wasn't thrown out as fate or state of claim. I think that the evidence does not support, the law does not support a claim for constructive fraud because there's no fiduciary duty. So you're arguing that there will be six rather than a summary? No, I'm arguing that there isn't any evidence. And at this point, the evidence, plaintiff has to come forward with some evidence that we used the money improperly. There's absolutely no evidence that the bank just kept this money. All the evidence is, as Mr. Odenkirk, their own expert, said. Would you, did you all give the money to MidCountry? You are MidCountry. We are MidCountry. You are MidCountry. You kept it. At that point, MidCountry would use the funds to complete, because you were the ones who were supposed to build the thing. You're supposed to finish building it on this thing. That's correct. MidCountry would use the remaining funds to complete construction. That's correct. But you didn't do it. No, they did what they could to get the house into a position to sell and it was sold at foreclosure and it's been ultimately sold by somebody else. Did you put the money into the house? The record is not clear on that. But you say it doesn't matter because this is not a contract claim. It's a constructive fraud claim and there is no fiduciary relationship as a matter of law. As a matter of law, there's no fiduciary relationship and the court and the case law in North Carolina is very clear that a lender does not owe any duty to a borrower and certainly I would submit to the court that it does not owe any duty to a fellow creditor. To follow up on Judge Harris' point, North Carolina law has never recognized that two parties to a commercial contract involving a loan that one party has a fiduciary relationship running to another. You have a contractual duty which runs to another but you don't have a fiduciary relationship. Now, conceivably, there could be some sort of fiduciary relationship if this were a non-commercial entity or somebody who had absolutely no way to fend for themselves because part of the whole concept of fiduciary duty is that the person who is an imbalance of power or an inability in all kinds of ways to take advantage of another. But that's not the case in a contract negotiation between two commercial entities, both of whom were advised by lawyers and in Dream Street's case by a real estate investor and a banker and everybody else. And to the degree that a fiduciary relationship would run, it would run to the borrower and Ingram was the borrower and he's not here and he's not claiming any breach of a fiduciary duty. You know, you can't just transmute every breach of contract claim into a breach of fiduciary duty claim or a UDTPA practice. It'll destroy commercial life. I agree, Your Honor, and I think the case on North Carolina would support that conclusion. That's over and apart from the statute of limitations problem, which is serious enough in and of itself. But the statute of limitations problem doesn't have anything to do with the second claim. It only applies to your first claim, their first claim. That's correct, Your Honor. I mean, the judge ruled the statute of limitations on the first claim, ruled summary judgment on the other claim. And my problem is, if you didn't use the money according to what the agreement was, which said that you're going to complete construction of the home, what gives you the right to keep the money? It wasn't your money. But it's not the plaintiff's money either. Maybe they didn't plead the case right. Maybe they didn't. Maybe the statute of limitations ran. I don't know, but I don't know how the money, if you didn't use it according to what the agreement was, that the remaining funds would complete construction, what gives you, the bank, the right to keep it? I mean, that's a conversion or something. But I don't think it's the plaintiff's money. It's not the plaintiff's money, Your Honor. I don't know whose money it is, but it wasn't yours. But we were holding the money. I guess maybe it is now. You're the last one who got it. It may be possessions, 100 percent of the law down here. But it wasn't yours. You were holding it for somebody else for another purpose, and then you kept it. The bank, Your Honor, had a loan that was in default, and the house was not complete. And if you look closely at the agreement, which is the email, it speaks of how, and it says, I understand that the only reason the whole bank would not be available was if Carl was in default. And so when it talks about being available. In default or unable to complete construction, or unable to complete construction. On either of those contingencies, at that point, MidCountry would use the remaining funds to complete construction. But nowhere does it say. That's the only option you had. If there was a default or if there was unable to complete construction, the only option you had was to complete construction, according to that email of June the 12th, 2008. But nowhere in that email does it state that the money then would be returned to plaintiff. No, it doesn't say. It says you should use them to complete construction. That's what, I mean, we, yeah, it says what it says. So this goes to this question I asked your colleague before. Is there evidence in the record that the actual plaintiff in front of us, Dream Street, was injured for want of having put the money into construction? Is there something in the record that you can say that's true? Is there something in the record that would allow us to figure out what that injury looks like? No, there's no evidence of injury. I mean, I get the sort of series of kind of inferences you make. I understand how logically it might have turned out that way. But I had trouble finding record evidence that shows that it did. There's no evidence of any damages to the plaintiff in this record. What would ever be the conceivable damages? The loss of the $43,200 would be a conceivable damage. But the idea was that if you had put the money into the reconstruction, the land would have sold for more, the property would have sold for more, and didn't Dream Street have like a, what do you call it, a security? Second, deed of trust. Yes, that's what I'm trying to say. And so they might have been able to recover some part of that. Well, the intent of the whole process, and this was before the housing crunch, was that the bank would lend this borrower money to be his own general contractor. He would then build a house that was worth X and then convert the construction loan to permanent financing. And when that conversion was done, there would be enough equity in the newly built house in order to pay off the second deed of trust to Dream Street. Okay. So I think that's what was envisioned. That never happened because of the foreclosure, both the default and then the foreclosure. The theory is had the money at that point been put into reconstruction, the equity would have been, there would have been more equity and at least some part of that note could have been paid off. That's correct, Your Honor. So during the foreclosure sale, did Dream Street ever assert any security interests? There's no record, there's nothing in the record to suggest that Dream Street attempted to preserve or protect its rights in the property at all. It just, see, part of this is, I don't know, because you've got someone that sits on a suit over four years and then you've got a situation where they're not asserting any security rights at the foreclosure sale. You get somebody that's sitting on their hands. Right. They could have brought the suit in 2009 when they were told they weren't getting the money back after they made their demand. They could have brought some action in 2012 as part of the foreclosure action, but they didn't do it at that time either. They waited until June and July of 2013 before they brought this action. In summary, I would submit that the District Court was correct that this action was barred by the statute of limitations as to the unfair and deceptive trade practices and as to the constructive fraud that the plaintiff has simply not shown any sort of fiduciary duty. And there certainly is no evidence that the defendant has taken advantage of that relationship. They acted as they thought was proper and reasonably necessary in this particular case and that's one of the elements of constructive fraud is that somehow that there's been a loss because of the taking advantage of the relationship. So what you're saying here is that before you even get any further, you've got to threshold questions with respect to the UDTPA, you've got the statute of limitations problem. And with respect to any kind of constructive fraud, you've got a fiduciary, you've got a threshold question of fiduciary duty? That's absolutely correct, Your Honor. And I don't think the plaintiff has meant that. They've got two significant threshold questions. Correct. That is correct. And certainly, as Judge Harris has noted, there's absolutely no evidence of any actual damages. Some maybe can be inferred, but there's no evidence of actual damages suffered by the plaintiff because of this agreement between the parties. And that's a third, that's another element of the constructive fraud claim? You have to show the... Yes. Under North Carolina law, you do. And again, if this Court looks at the most recent rulings from the North Carolina Supreme Court, where they've looked at the issue of whether there's any sort of duty between a lender and a borrower, the Court has consistently held, most recently in the Arnson case, that there's no duty under North Carolina law between a lender and a borrower, other than what's set out in the agreement or in the UCC. And that hasn't even been pledged in this case. And in this case, Dream Street is not a borrower. Dream Street is a fellow creditor. And we would submit that there's absolutely no duty under North Carolina law, and therefore the ruling of the District Court was correct and should be affirmed. Thank you. Thank you. Ms. Stevens? Respectfully, Your Honor, this is not a routine commercial transaction. Banks are not in the practice of entering into financial agreements memorialized by emails unless they're intentionally trying to keep things vague and deceptive. With respect to the constructive fraud claim, you don't even have to get to the point of deciding whether they should have used this money to complete construction. It is disputed whether construction was completed. The only evidence in the record concerning completion of construction is a certificate of compliance obtained by Ingraham on December 10, 2009. Now, MidCountry has contended there were some HOA issues outstanding, but the HOA covenants are not in the record. We have no idea what these, you know, alleged deficiencies in construction were. So if your position is that construction was completed, there was also a default, and the bank had promised to put the money, if there was a default, into completing construction, how was that supposed to work if construction was completed? What were they supposed to do? Well, from the understanding of the email, when construction was completed, the money was to be released back to Dream Street. Well, not if there had been a default. But the default didn't occur until February. So, you know, that is... Just assume with me, because I think, right, just hypothetically, construction has been completed. There is a default. What's the bank supposed to do with the money? The agreement, you say, is fairly read to that they're supposed to put the money, in the case of a default, into completing construction. But your position is construction was completed. Right. That means, I guess, they can keep it.  You know, that's one, you know, I agree there's, you know, different ways that a reasonable mind could differ. What you say is not in that email of 2008. It is. It is? So, the only way the money would not be available is if construction is not completed, is the first phrase. You know, that phrase can be taken alone. That they had an obligation of repayment upon completion of construction. Which, you know, when the... What constitutes completion of construction is not defined in the email. What, you know, in general practice, a home is deemed completed when it's habitable, when it can be occupied, according to the municipality. I'm just trying to figure out, if the house was completed, then how is the bank supposed to put the money into completion of the house? Well, if it was completed, you know, they didn't have to put any, you know... Even if there was a default, is your position. Right. They just should have released the seller hold back to... Even if there had, in fact, been a default. Correct. Because the default occurred subsequent to the completion of construction. What if the... I guess I'm... It's disputed when the default occurred. Assume with me it actually occurred in September before construction was completed. So now what is the bank supposed to do with the money? There's been a default, so it's not supposed to release the money back. The house is completed, so it can't put the money into completing the house. Right. If... Then what? If you do take the September date as the default date, then the money should have been put towards construction. Right. But the house is finished. The house is finished in December. But, you know, if they had put the money towards the house, it might have been finished before December. You know, he was using funds from relatives to complete this house because the bank had stopped funding dispersals of loan amount. So he was just scraping together funds. How is this hurting Dream Street? I mean, I don't... He lost $43,000 that he... No, because it would have been put into the... It would have been put into the house, right, under your theory. Then the house... There was a foreclosure sale on the house. You never asserted any kind of security interest in the foreclosure sale. I mean, this is the problem. It is, in addition to the statute of limitations problem and the fiduciary duty problem, I don't understand how you have been harmed in some way. Because even if the money was going to go into the construction of the house, there's going to be a foreclosure sale, probably, in the event of a default. The foreclosure sale takes place. You never assert any security interest or any interest within the foreclosure sale. I mean, the problem is, in one instance after another, you're sitting on your hands and want us to bail you out with these kinds of positions that I do think were harm on North Carolina law. Well, respectfully, Your Honor, I think that the North Carolina courts have recognized a fiduciary duty between people in a partnership arrangement like this. This is not a lender-borrower agreement between MidCountry and Dream Street. It's more of a partnership agreement to allow the loan to... If you got most of what you wanted, you got the loan. The loan wouldn't have gone through without the seller hold back. Right, but, you know, Dream Street had no idea at the time that it was being sold that this borrower was grossly underqualified. And, you know, this is the case that stems out of all the financial abuses the banks were undertaking, you know, qualifying people that couldn't afford these loans. And this is even more egregious that they're going after money from third-party sellers in order to qualify their unqualified borrowers. Appreciate it. We'll come down and greet counsel, and then we'll take a brief recess. This honorable court will take a brief recess.
judges: J. Harvie Wilkinson III, Robert B. King, Pamela A. Harris